1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

      Plaintiff,

  v.

GREGORY L. REYES and STEPHANIE JENSEN,

      Defendants.

_____/

No. CR 06-0556 CRB

**MEMORANDUM AND ORDER**

     The United States indicted Gregory Reyes and Stephanie Jensen for crimes allegedly committed when they were the Chief Executive Officer and Vice President of Human Resources, respectively, of a publicly traded company called Brocade Communications Systems, Inc. ("Brocade").  In a pre-trial motion, Reyes requested permission to issue subpoenas on various third parties, pursuant to Rule 17(c).  The government did not oppose Reyes' request.  Following a hearing on the motion, this Court granted Reyes permission to issue the subpoenas but explicitly anticipated that they would be subject to challenge by the subpoenaed third parties.

     Three such challenges are now pending before the Court.  In each one, the subpoenaed party has moved the Court to quash Reyes' demand for the production of documents, arguing that his subpoena fails to comply with Rule 17(c).  In addition, two of the movants argue that the materials identified in the subpoenas are protected by both the attorney-client privilege and the attorney work-product privilege.

**United States District Court**
For the Northern District of California

**BACKGROUND**

In October of 2004, an unhappy former employee threatened to sue Brocade, alleging that the company had committed fraud and kept crooked books in connection with certain stock options it had issued.  As a result of this threat, and in anticipation of litigation, Brocade's Audit Committee launched an internal investigation.  The Audit Committee sought the assistance of two law firms, Morrison & Foerster ("MoFo") and Wilson Sonsini Goodrich & Rosati ("WSG&R"), to examine the company's practices relating to stock-option grants.

MoFo and WSG&R did not play identical roles during the investigation.  Throughout the inquiry, MoFo served strictly as an outside, independent investigator.  Thus, MoFo attorneys conducted interviews of numerous Brocade employees and enlisted the help of accountants at PricewaterhouseCoopers ("PwC") to scrutinize the company's financial records and statements.  According to MoFo, the firm's attorneys did not prepare "any written report regarding any findings from the Audit Committee's internal investigations," nor did they create "documents reflecting how much of Brocade's restatements, if any, were related to stock-option accounting issues."  Decl. of Craig D. Martin ¶¶ 8, 10.  Nonetheless, the firm did retain handwritten notes from the interviews it held, as well as other work product relating to the investigation.  Id. ¶¶ 5, 11.  By contrast, WSG&R served as counsel to Brocade and certain Brocade employees in connection with anticipated civil litigation and potential regulatory action by the SEC.  In this capacity, WSG&R attorneys conducted their own interviews of Brocade employees and often attended interviews conducted by the outside investigators.  Decl. of Nina F. Locker ¶ 12.

Following the internal investigation, Brocade announced that it would restate earnings for fiscal years 1999 through 2004.  An initial restatement in January of 2005 disclosed a net loss of approximately $300 million.  Indictment ¶ 31.  Another restatement in May of 2005 disclosed an additional $0.8 million in compensation expenses related to certain stock options granted by the company.  Id. ¶ 32.

**United States District Court**
For the Northern District of California

1    These restatements attracted the attention of shareholders, regulators, and law

2  enforcement officials alike.  Thus, at the direction of their mutual client, Brocade's Audit

3  Committee, the attorney-investigators at MoFo and WSG&R conferred with each other about

4  their findings and both agreed to meet with officials from the Securities and Exchange

5  Commission ("SEC") and the Department of Justice ("DOJ").  The law firms did not provide

6  the government with any written material, though both prepared notes and memoranda in

7  preparation for the meetings.  See Martin Decl. ¶ 8; Locker Decl. ¶¶ 14-16.  Instead, the

8  MoFo attorneys provided the government with only oral briefings on their interviews and

9  findings.  Meanwhile, WSG&R provided briefings, as well as a multimedia presentation.

10  MoFo and WSG&R both signed confidentiality agreements with the government, specifically

11  disavowing any intent to waive applicable privileges.  While these agreements purported to

12  restrict dissemination of the sensitive information at issue to other parties, they nonetheless

13  granted the government agencies discretion to reveal the disclosed information to others as

14  their duties required.

15    In the wake of Brocade's public and private disclosures, a flurry of legal activity

16  ensued, in both federal and state courts.  No fewer than five independent cases are now

17  pending before this Court, all of which relate to the alleged backdating of stock options at

18  Brocade.  These include a class action by shareholders, two derivative lawsuits, an SEC

19  enforcement action, and a criminal case against Reyes and Jensen.  It is in connection with

20  this last matter that Reyes issued his subpoenas, seeking the production of various documents

21  to assist in his criminal defense.  The parties subpoenaed by Reyes include: (1) MoFo,

22  (2) WSG&R, and (3) Maxim Integrated Products, Inc. ("Maxim").  These three parties then

23  moved to quash the subpoenas.

24                                      **DISCUSSION**

25    Notwithstanding the differences between each of the subpoenas and the unique

26  subpoenaed parties, the inquiry is the same for each of the motions to quash.  The Court

27  initially must determine whether the subpoena complies with Rule 17(c), and if so, whether

28

United States District Court

For the Northern District of California

1    the materials identified therein are privileged.  A brief discussion of the legal principles

2    governing these two inquiries is therefore useful.

3         Under Rule 17(c), a criminal defendant may compel the production of "any books,

4    papers, documents, data, or other objects."  Fed. R. Crim. P. 17(c)(1).  The rule also allows a

5    district court to direct the subpoenaed parties to produce the requested items for the court's

6    own review, after which the court "may permit the parties and their attorneys to inspect all or

7    part of them."  Id.  Furthermore, upon the motion of a subpoenaed party, "the court may

8    quash or modify the subpoena if compliance would be unreasonable or oppressive."  Fed. R.

9    Crim. P. 17(c)(2).

10        Rule 17(c) is not as broad as its plain language suggests, however, and it is more

11   narrow in scope than the corollary rules of civil procedure, which permit broad discovery.

12   As the Supreme Court stated in Bowman Dairy Co. v. United States, 341 U.S. 214 (1951),

13   "Rule 17(c) was not intended to provide an additional means of discovery," but rather "to

14   expedite the trial" by giving a defendant the right to inspect items within his adversary's

15   possession, including items voluntarily provided to the government by third persons.  Id. at

16   220-21.  The Court in Bowman Dairy thus permitted the criminal defendant to use Rule 17(c)

17   collect certain documents that had been withheld by the prosecutor, but it quashed an

18   expansive "catch-all provision" in the subpoena that was "not intended to produce

19   evidentiary materials" but served "merely [as] a fishing expedition to see what may turn up."

20   Id. at 221.  See also United States v. MacKey, 647 F.2d 898, 901 (9th Cir. 1981) ("[A] Rule

21   17(c) subpoena is not intended to serve as a discovery tool, or to allow a blind fishing

22   expedition seeking unknown evidence . . . .") (citation omitted); 2 Charles Alan Wright et al,

23   Federal Practice & Procedure § 274, at 242-43 (hereinafter "Federal Practice & Procedure")

24   (noting that "it has always been clear that Rule 17(c) was not intended as a discovery

25   device," and observing that the rule "is limited to evidentiary materials").[1]

26   _____

27        [1] In support of all three subpoenas, Reyes argues that Rule 17(c) applies differently to
     third parties than it does to the government.  While he acknowledges that the rule does not allow
28   him to discover any and all material in the hands of the prosecutor, he contends that Rule 17(c)
     nonetheless permits broad discovery from third parties.  Cf. Nixon, 481 U.S. at 699 n.12

4

**United States District Court**
For the Northern District of California

1    In <u>United States v. Nixon</u>, 418 U.S. 683 (1974), the Supreme Court held that the

2    proponent of the subpoena "must clear three hurdles: (1) relevancy; (2) admissibility; and (3)

3    specificity." <u>Id.</u> at 700; <u>see also</u> <u>United States v. Reed</u>, 726 F.2d 570, 577 (9th Cir. 1984);

4    <u>United States v. Eden</u>, 659 F.2d 1376, 1381 (9th Cir. 1981).  Furthermore, even upon a

5    showing that the subpoena seeks relevant, admissible, and specific evidence, a court must

6    consider whether the materials are "otherwise procurable reasonably in advance of trial by

7    exercise of due diligence," whether the proponent can "properly prepare for trial without

8    such production and inspection in advance of trial," and whether "the failure to obtain such

9    inspection may tend unreasonably to delay the trial." <u>Nixon</u>, 418 U.S. at 699, 702; <u>see also</u>

10   <u>Eden</u>, 659 F.2d at 1381.

11   Further, a Rule 17(c) subpoena "should be quashed or modified if it calls for

12   privileged matter." 2 Federal Practice & Procedure § 275, at 258; <u>see also</u> <u>United States v.</u>

13   <u>Tomison</u>, 969 F. Supp. 587, 597 (E.D. Cal. 1997).  In this case, two privileges are pertinent.

14   The first is the attorney-client privilege, which shields from disclosure any communications

15   made in confidence by a client to an attorney for the purpose of seeking professional legal

16   advice.  <u>In re Fischel</u>, 557 F.2d 209, 211 (9th Cir. 1977).  The attorney-client privilege

17   applies in the context of a corporation as well, protecting the communications of both

18

19   (reserving judgment on the question of whether the evidentiary requirements of Rule 17(c) "apply in [their] full vigor when the subpoena *duces tecum* is issued to third parties rather than

20   to government prosecutors").

21   The Court rejects Reyes' suggestion, which is contrary to binding authority, and unsupported even by the two sources he cites in favor of it.  A careful reading of the Wright &

22   Miller treatise, which Reyes cites, recommends a narrow view of his power to subpoena.  <u>See</u> 2 Federal Practice & Procedure § 274, at 242, 250 (noting that many parties "desire to use [the

23   rule] for discovery purposes," but observing that it "was not intended as a discovery device," and calling such use of the rule a "distortion").  Reyes' citation to <u>United States v. Tomison</u>, 969 F.

24   Supp. 587 (E.D. Cal. 1997), is no more persuasive.  In that case, the district court remarked, in a footnote that can only be characterized as the purest form of dicta, that "Rule 17(c) may well

25   be a proper device for discovering documents in the hands of third parties." <u>Id.</u> at 593 n.14  But this remark was made in the context of a case about a subpoena issued to the government, not

26   to a third party; it appears in a discussion about the government's standing to challenge a Rule 17(c) subpoena, not about the scope of material available to criminal defendants under the rule;

27   and the court's scholarly rumination about the potentially broad use of Rule 17(c) was utterly immaterial to its holding, which was to quash the subpoena. <u>Id.</u> at 593-98.  Moreover, the Ninth

28   Circuit has flatly rejected Reyes' expansive construction of Rule 17(c). <u>United States v. Fields</u>, 663 F.2d 880 (9th Cir. 1981) ("[W]e see no basis for using a lesser evidentiary standard merely because production is sought from a third party rather than from the United States.").

corporate officers and employees.  Upjohn Co. v. United States, 449 U.S. 383, 394-95 (1981).  It also applies in the context of an investigation or fact-finding inquiry conducted by a company's attorneys, though it will not allow attorneys or their corporate clients to conceal material facts about their conduct.  See id. at 390 ("[T]he privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice."); id. at 395 ("The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney[.]").

The second relevant doctrine is the attorney work-product privilege.  As explained by the Supreme Court, the work-product privilege safeguards "written statements, private memoranda and personal recollections prepared or formed by an adverse party's counsel in the course of his legal duties."  Hickman v. Taylor, 329 U.S. 495, 510 (1947).  Such materials fall "outside the arena of discovery" because "[p]roper preparation of a client's case demands that [an attorney] assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference."  Id. at 510-11.  The work-product privilege does not insulate all of an attorney's work product; instead, under Ninth Circuit law, the test is whether the attorney would have generated the material "but for" the prospect of litigation, though it is immaterial whether or when litigation actually begins.  In re Grand Jury Subpoena (Torf), 357 F.3d 900, 910 (9th Cir. 2004).

Both privileges are subject to waiver.  Generally speaking, the attorney-client privilege is waived upon the voluntary disclosure of protected information by a client, or by an attorney at the behest of a client.  See, e.g., Weil v. Investment/Indicators, Research & Mgmt., Inc., 647 F.2d 18, 24 (9th Cir.1981).  Similarly, courts are in accord that the attorney work-product privilege is not absolute and may be waived, for example, when an attorney attempts to use the work product as testimony or evidence, or reveals it to an adversary to gain an advantage in litigation.  See United States v. Nobles, 422 U.S. 225, 239-40 (1974).  While there is occasional disagreement about how, and to what extent, an attorney may

waive or preserve the privilege that attaches to his various forms of work product, the Ninth Circuit has noted that "when a party makes a substantial showing that he is unable through his efforts to obtain needed information, the balance of equities shifts in favor of disclosure of trial preparation materials." Admiral Ins. Co. v. U.S. Dist. Court for the Dist. of Ariz., 881 F.2d 1486, 1494 (9th Cir. 1989); see also Hickman, 329 U.S. at 508 (refusing inspection of "oral and written statements of witnesses whose identity is well known and whose availability to [the proponent of discovery] appears unimpaired").

With these general principles in mind, the Court now turns to an examination of the subpoenas issued by Reyes, and the pending motions to quash them.

## I. WSG&R and MoFo

The subpoena served on WSG&R seeks materials related to the firm's involvement in Brocade's internal investigation. Specifically, the subpoena commands production of the following items:

> (1) Interview summaries, notes and memoranda related to the interviews of Brocade employees interviewed in connection with Brocade Communication Systems, Inc's internal investigation in 2004 and 2005 into options-related issues.
>
> (2) Any written reports or notes of presentations made to or meetings with any government agency from 2004 through 2006, including the Securities & Exchange Commission and Department of Justice, related to Brocade's option grant investigation.

Similarly, the subpoena served on MoFo demands the production of documents created by that law firm in connection with its retention as outside counsel in the investigation. It seeks:

> (1) Interview summaries, reports, notes and memoranda, in whatever form (typed, handwritten, etc.) related to the interviews of Brocade employees interviewed in connection with Brocade's internal investigation in 2004 and 2005 into options issues.
>
> (2) Any reports, in whatever form, related to Brocade's option granting practices, which were shared with any agency of the government, including the Securities & Exchange Commission and Department of Justice (including summaries of oral reports made to the government).
>
> (3) Reports, notes, memoranda, comments or conclusions made in con[n]ection with Brocade's internal investigation in 2004 and 2005 related to any option grant to any Brocade employee, including determinations about measurement dates for option grants and what type of accounting to apply to option grants.

United States District Court
For the Northern District of California

7

Reyes argues that these materials include "the earliest statements made by the key witnesses about the event in this case," as well as evidence showing "that a team of legal and accounting experts, operating with all the benefits of hindsight and abundant time and resources, did not conclude that Mr. Reyes (or anyone else) committed securities fraud." He contends that he must have access to these materials "for his defense."

### A. Rule 17(c)

The Court holds that, at least at this stage of the proceedings, Reyes' requests do not satisfy the strictures of Rule 17(c). As noted above, the proponent of a subpoena bears the burden of proving that the information sought is relevant, specific, and admissible. Nixon, 418 U.S. at 700; Reed, 726 F.2d at 577; Eden, 659 F.2d at 1381. Admittedly, Reyes has requested relevant materials--the documents he seeks pertain to an internal investigation by Brocade into the very activities that now form the basis of a criminal indictment against him. There can be no dispute that any summaries, notes, memoranda, and reports generated by MoFo or WSG&R in the context of the Audit Committee's internal investigation are germane to his criminal prosecution. Reyes has also requested materials from MoFo and WSG&R with the requisite specificity. His request is neither improperly broad, nor overly vague; instead, Reyes demands access to a discrete set of existing written materials, within the possession of the subpoenaed parties, that pertain to events and conversations that actually occurred and relate to specific subject matter. As the Supreme Court has noted, the proponent of a subpoena cannot be expected to identify the materials he seeks in exacting detail, when (as demonstrated by the fact that he must employ a subpoena) he does not have access to them. See Nixon, 418 U.S. at 700. Instead, Rule 17(c) requires a party to provide details sufficient to establish that the subpoena's proponent has made a good-faith effort to obtain evidentiary material and is not engaged in the proverbial "fishing expedition." See id. at 699-700; 2 Federal Practice & Procedure § 275, at 252 ("A subpoena that fails to describe any specific documents is too broad, but it is not necessary that the subpoena designate each particular paper desired."). Here, Reyes has satisfied that burden.

United States District Court

For the Northern District of California

1   Reyes' stumbling block, however, is admissibility.  Reyes vehemently contends that

2   these documents will exonerate him by showing his lack of culpability in the alleged

3   backdating and by revealing how Brocade arrived at its decision to restate earnings,

4   including what portion of the restatement is directly attributable to any alleged improprieties

5   in the methods used to distribute or account for stock options.  Even assuming that the

6   subpoenaed materials say what Reyes thinks they do, an assertion the law firms dispute,

7   these materials still would not be admissible.  The first set of materials--that is, the

8   "summaries, notes and memoranda related to the interviews of Brocade employees"--

9   includes only hearsay.  To the extent that Reyes seeks evidence of what WSG&R told the

10   government about these interviews, the materials would be hearsay-upon-hearsay.  So too are

11   the other categories of documents inadmissible: the second-hand reflections, findings, and

12   conclusions of investigating attorneys would not themselves become evidence at trial to

13   prove the truth of the matters they assert.  Moreover, an attorney's formal opinion about

14   whether any crimes were committed would not be relevant evidence--that determination is

15   for a jury of Reyes' peers to make, not for MoFo or WSG&R.  Simply put, Reyes has

16   proffered no persuasive  reason why the written records generated by MoFo or WSG&R

17   would be admissible in and of themselves.

18   Reyes suggests that the items would fall under one of several exceptions to the

19   hearsay rule, either as present sense impressions, past recollections recorded, or business

20   records.  The law, however, is to the contrary.  An out-of-court statement is admissible as a

21   present sense impression if it was "made while the declarant was perceiving the event or

22   condition, or immediately thereafter."  Fed. R. Evid. 803(1).  A witness's statement to an

23   investigator about business activities conducted over the course of several years could not

24   possibly qualify.  Similarly, a recorded recollection is admissible only if it concerns "a matter

25   about which a witness once had knowledge but now has insufficient recollection to enable

26   the witness to testify fully and accurately."  Fed. R. Evid. 803(5).  Notwithstanding Reyes'

27   observation that the statements he seeks were made about two years ago, he has made no

28   showing that the witnesses interviewed by MoFo or WSG&R would be unable to remember

9

what they said.  The mere passage of time does not make a statement admissible as a past recollection; to hold otherwise would swallow the rule entirely--*all* hearsay involves a prior out-of-court statement.  Finally, the subpoenaed materials do not fall under the business records exception, which permits the introduction of items "kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation."  Fed. R. Evid. 803(6). Documents produced in a full-fledged, one-time internal investigation into alleged corporate malfeasance do not fall under this rubric.  And for good reason: they lack the hallmarks of reliability that justify the admission of run-of-the-mill business records.

Next, Reyes contends that the subpoenaed materials are necessary for his defense team to "reverse engineer" Brocade's restatements, an "extensive and time-consuming" process.  This is an argument about convenience, not admissibility.  A document does not become admissible simply because it is helpful.  Nor was Rule 17(c) designed to eliminate the burdens of the adversarial process.  Cf. Hickman, 329 U.S. at 516 (Jackson, J., concurring) ("Discovery was hardly intended to enable a learned profession to perform its functions either without wits or on wits borrowed from the adversary.").  It is true, as Reyes argues, that a court must examine the burden on a defendant of independently procuring the subpoenaed materials.  See Nixon, 418 U.S. at 699.  But even a heavy burden does not obviate the requirements of relevancy, specificity, and admissibility.  Eden, 659 F.2d at 1381 (noting that Rule 17(c) establishes threshold requirements, and adding that "[i]n order to justify a subpoena for production before trial, the proponent must *also* demonstrate that the subpoenaed materials are not available from any other source and their examination and processing should not await trial") (emphasis added).  Because Reyes cannot demonstrate that the items he seeks are themselves admissible, the putatively heavy burden he faces in obtaining the information contained in them does not save his subpoenas.

That these records are not themselves admissible, however, does not mean that they could never be used as evidence.  As Reyes rightly points out, many of the witnesses interviewed by MoFo and WSG&R are likely to testify at trial.  If and when they do, their

United States District Court

For the Northern District of California

1  prior statements to internal investigators could become admissible as prior inconsistent

2  statements--that is, for impeachment purposes.  Unfortunately for Reyes, Rule 17(c) does not

3  entitle him to the pre-trial production of impeachment material.  Nixon, 418 U.S. at 701

4  ("Generally, the need for evidence to impeach witnesses is insufficient to require its

5  production in advance of trial."); United States v. Fields, 663 F.2d 880, 881 (9th Cir. 1981)

6  ("The only evidentiary use that defendants have been able to advance is that the statements

7  and transcribed interviews of witnesses could be used for impeachment purposes.  This use is

8  generally insufficient to justify the pretrial production of documents . . . .") (citations

9  omitted).

10      In situations like this, where a defendant has identified evidence that would be

11  admissible for impeachment but not otherwise, several courts have ordered the items

12  produced for *in camera* inspection so that the court may review the material and disclose it, if

13  ever, when it becomes ripe for impeachment.  See United States v. Cuthbertson, 630 F.2d

14  139, 144-45 (3d Cir. 1980) (finding that the district court had acted within its discretion "in

15  requiring pretrial production to the court to expedite its trial decisions"), cert. denied, 449

16  U.S. 1126 (1981); Fields, 663 F.2d at 881 (suggesting that a sufficient showing of relevancy

17  and specificity would "warrant *in camera* production to the district court for possible release

18  after the evidentiary requirement had been met," but declining to decide whether the

19  defendant had made such a showing); see also Reed, 726 F.2d at 577 (affirming the decision

20  of a trial judge who "reviewed the documents *in camera*, denied the application and quashed

21  the subpoena").  The Court concludes that this procedure is appropriate where, as here, a

22  criminal defendant has made a persuasive showing that a third party possesses specific

23  material that both is highly relevant to the criminal charges pending against him, and may

24  become admissible upon the testimony of witnesses who are likely to testify at trial.  *In*

25  *camera* inspection is also appropriate in this case because the specific documents sought

26  were, at least in part, the very impetus for such the government's prosecution of Reyes.

27      In sum, the Court concludes that Reyes has failed to justify the pre-trial production of

28  the materials requested in his subpoenas.  Nonetheless, because he has identified specific and

**United States District Court**
For the Northern District of California

relevant material that is likely to become admissible at trial, the Court is prepared to compel the production of such materials to the Court for *in camera* review and, when necessary, disclosure.  The Court acknowledges Reyes' contention that *in camera* review will not provide him with the robust remedy he prefers.  It is no doubt true that an impartial tribunal will not act with the same zeal as an advocate when reviewing prior statements for inconsistencies, a circumstance that the law both contemplates and commends.  See Hickman, 329 U.S. 517 (Jackson, J., concurring) (noting that every attorney's recollection of a witness's statements will include "departures in some respects," and observing the danger in letting the witness's adversary use such recollections for impeachment purposes).  Regardless of the wisdom or efficacy of *in camera* review, it is the only route available to Reyes.  The law does not entitled him to obtain documents merely because he might be more vigilant than the court in spotting a basis for admitting them.  A contrary rule would turn Nixon on its head--the Supreme Court requires the proponent of a subpoena to identify a basis for admitting evidence before he receives them, not after.  Delay is the price Reyes must pay for his own failure to identify an evidentiary basis for the materials he subpoenaed.

*B.  Privilege*

MoFo and WSG&R both contend that, even if Reyes' subpoenas satisfy Rule 17(c), the materials identified therein still enjoy the protection of the attorney-client privilege and the attorney work-product privilege.  This Court disagrees.

To be sure, all of the subpoenaed items fall squarely under the rubric of both privileges.  They constitute confidential communications between attorneys and the officers, employees, and former employees of a corporate client; they were made specifically for the purpose of obtaining professional legal advice in contemplation of an imminent investigation by federal authorities.  The Supreme Court's decision in Upjohn holds that the attorney-client privilege shields such material.  449 U.S. 383, 394-96.  Similarly, the subpoenaed materials all contain, even if only indirectly, the thoughts, reflections, analysis, conclusions, and mental impressions of the lawyers at MoFo and WSG&R.  As such, the attorney work-

United States District Court

For the Northern District of California

1   product privilege typically would thwart any outsider's attempt to unearth them.  Hickman,

2   329 U.S. at 511-13.[2]

3          The Court holds, however, that MoFo and WSG&R surrendered whatever privileges

4   may have attached to the subpoenaed materials when they shared their contents with the

5   government.  Because the law firms waived both the attorney-client privilege and the work-

6   product privilege when they disclosed the substance of their investigative interviews, reports,

7   and conclusions with the government, the Court finds that these privileges pose no obstacle

8   to Reyes' attempt to subpoena them.

9

10          [2] Reyes argues that he is entitled to the subpoenaed materials because he seeks only the
    facts contained in them, not the views of the lawyers.  That argument is without merit.  As the
11   Supreme Court explained:

12          [T]he protection of the privilege extends only to *communications* and not to facts.
            A fact is one thing and a communication concerning that fact is an entirely
13          different thing. The client cannot be compelled to answer the question, "What did
            you say or write to the attorney?" but may not refuse to disclose any relevant fact
14          within his knowledge merely because he incorporated a statement of such fact into
            his communication to his attorney.

15
    Upjohn, 449 U.S. at 395-96 (quoting Philadelphia v. Westinghouse Elec. Corp., 205 F. Supp.
16   830, 831 (E.D. Pa. 1962)) (alteration and emphasis in original).  In other words, a
    communication with an attorney does not cease to be confidential merely because it is about
17   a fact that is otherwise discoverable.  Where, as here, an attorney's work product records his
    recollection of an interview with a witness, which necessarily includes relevant facts, it is
18   nearly impossible to distinguish between the two.  See id. at 399 ("Forcing an attorney to
    disclose notes and memoranda of witnesses' oral statements is particularly disfavored because
19   it tends to reveal the attorney's mental processes.") (citations omitted). Understandably, then,
    courts have declined to attempt to parse the difference between them when witnesses remain
20   available for the party seeking information to talk to them himself.  See Hickman, 329 U.S.
    at 513 (refusing to permit discovery of an attorney's interview notes when the information was
21   otherwise available through the usual tools of investigation, including "direct interviews with
    the witnesses themselves").
22
           Unlike other cases in which courts have declined to apply to the work-product privilege,
23   Reyes has made no showing in this case that the information contained in the subpoenaed
    materials is otherwise unavailable to him.  See, e.g., Xerox Corp. v. Int'l Bus. Machs. Corp., 79
24   F.R.D. 7, 8 (S.D.N.Y. 1977) (permitting the discovery of interview notes when the party seeking
    them had deposed thirty-three of thirty-seven relevant witnesses, all of whom failed to recall the
25   relevant information contained in the notes, and there was no reason to think "that the
    recollections of those persons not yet deposed would be any better").  He claims only that the
26   witness statements "are the earliest accounts of witness recollections about key events" and that
    "it is critical to obtain the relevant information as quickly as possible since recollections can
27   change over time."  This boils down to an argument that he must have the witness statements
    because the witness statements themselves are unavailable to him, not that the information
28   contained in them is unavailable.  Abandoning the work-product privilege on account of this
    tautology, without an actual showing of unavailability, would render the privilege meaningless.

MoFo and WSG&R concede that courts have been "reluctant" to permit the selective waiver of attorney-client privilege. This puts the matter charitably: though the Ninth Circuit has not addressed the issue directly, other federal courts of appeals have overwhelmingly disapproved of the practice. See In re Columbia/HCA Healthcare Corp. Billing Practices Litig., 293 F.3d 289, 302-04 (6th Cir. 2002); United States v. Mass. Inst. of Tech. (MIT), 129 F.3d 681, 684-86 (1st Cir. 1997); Genentech, Inc. v. U.S. Int'l Trade Comm'n, 122 F.3d 1409, 1415-18 (Fed. Cir. 1997); In re Steinhardt Partners, L.P., 9 F.3d 230, 234-36 (2d Cir. 1993); Westinghouse Elec. Corp. v. Republic of Philippines, 951 F.2d 1414, 1423-26 (3d Cir. 1991); In re Martin Marietta Corp., 856 F.2d 619, 623-26 (4th Cir. 1988); Permian Corp. v. United States, 665 F.2d 1214, 1220-22 (D.C. Cir. 1981). But see Diversified Indus., Inc. v. Meredith, 572 F.2d 596, 611 (8th Cir.1978) (en banc).

In accord with every appellate court that has considered the issue in the last twenty-five years, this Court holds that Brocade's Audit Committee, and their attorneys at MoFo and WSG&R, cannot waive the attorney-client privilege selectively. Parties "cannot be permitted to pick and choose" in their disclosure of protected communications, "waiving the privilege for some and resurrecting the claim of confidentiality to obstruct others." Periman, 665 F.2d at 1221. Such arbitrary invocation of the privileges is inappropriate both because it bears no relationship to their purpose, which is to ensure that clients can consult frankly with their attorneys and that attorneys can prepare their cases effectively, and because it smacks of injustice when, as in this case, the favored party seizes upon the disclosed information to exercise legal leverage against the obstructed one. Id.; see also MIT, 129 F.3d at 684-85; Westinghouse, 1425-26 & n.13. Having lowered the shield to foster an amicable relationship with the government, Brocade's attorneys may not then raise it against parties injured by their disclosures. Periman, 665 F.3d at 1221 (remarking that a client may not "invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit").

In this Court's view, the fact that law-enforcement authorities are on the receiving end of a voluntary disclosure is not an adequate justification for keeping the attorney-client

14

United States District Court

For the Northern District of California

privilege in tact.  Accord MIT, 129 F.3d at 685-86; Genentech, 122 F.3d at 1417; In re Steinhardt Partners, 9 F.3d at 235; Westinghouse, 951 F.2d at 1424-26; In re Martin Marietta Corp., 856 F.2d at 623-24; Permian, 665 F.2d at 1220-21.  Many of the arguments advanced in support of this government-specific selective waiver are not unique to the governmental context--the disclosure of privileged always "furthers the truth-finding process," and the government does not have an exclusive claim to vindicating the public interest, especially in an area such as securities fraud, where private litigants may act as private attorneys general to ensure compliance with the law.  In re Columbia/HCA Healthcare Corp., 293 F.3d at 303.  Furthermore, it is clear not clear that publicly traded companies or the SEC will behave any differently if the court permits selective disclosure; the former remains under an fiduciary duty to shareholders to investigate and eradicate fraudulent activity, and the SEC is not so powerless that it needs a selective waiver to obtain information.  MIT, 129 F.3d at 685 (noting that "agencies usually have means to secure the information they need and, if not, can seek legislation from Congress"); see also In re Steinhardt Partners, 9 F.3d at 236 ("The SEC has continued to receive voluntary cooperation from subjects of investigations, notwithstanding the rejection of the selective waiver doctrine by two circuits and public statements from Directors of the Enforcement Division that the SEC considers voluntary disclosures to be discoverable and admissible."); In re Subpoena Duces Tecum, 738 F.2d 1367, 1375 (D.C. Cir. 1974) ("If a change is to be made [to the well-established rules of waiver] because it is thought that such voluntary disclosure programs are so important that they deserve special treatment, that is a policy matter for the Congress, or perhaps for the SEC . . . .").

Likewise, the Court finds that MoFo and WSG&R gave up their work-product privilege when they shared the substance of their work product with the government.  First, MoFo and WSG&R employed their confidential communications and their work product for testimonial and evidentiary purposes.  Though not used in a formal legal proceeding, their aim in disclosing the information was to share evidence and opinions about Brocade's backdating scandal with the very law-enforcement officials with power to punish the

United States District Court

For the Northern District of California

underlying conduct. The use of privileged material in such a capacity generally constitutes a waiver. See Nobles, 422 U.S. at 239-40 (holding that an attorney cannot "advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials"); see also In re Martin Marietta Corp., 856 F.2d at 625. Third, MoFo and WSG&R shared their confidential communications and work product with an adversary. MoFo attempts to portray the law firms as sharing a "common interest" with the SEC and DOJ--either in their mutual effort to uncover the truth about Brocade's backdating scandal, or perhaps in the more abstract sense of promoting the transparent operation of public markets. The argument is unconvincing: as Chief Judge Boudin recently observed, "this is not the kind of common interest to which the cases refer in recognizing that allied lawyers and clients--who are working together in prosecuting or defending a lawsuit or in certain other legal transactions-- can exchange information among themselves without loss of the privilege." MIT, 129 F.3d at 686. It strains credulity to argue that a company under threat of imminent regulatory action by the SEC shares a common interest with that agency, which is why courts have almost universally refused to include government officials in the "small circle of 'others' with whom information may be shared without loss of the privilege." Id. at 686; see also In re Steinhardt Partners, 9 F.3d, at 234; Westinghouse, 951 F.2d at 1431; In re Subpoenas Duces Tecum, 738 F.2d at 1372.

Nor do the putative confidentiality agreements executed by MoFo or WSG&R preserve the work-product privilege. Different judges have reached different conclusions, on remarkably similar facts, about whether a confidentiality agreement between disclosing and receiving parties may rescue or resuscitate an otherwise relinquished work-product privilege. Compare In re McKesson HBOC, Inc., Sec. Litig., 2005 WL 934331 (N.D. Cal. Mar. 31, 2005) (Whyte, J.), with United States v. Bergonzi, 216 F.R.D. 487 (N.D. Cal. 2003) (Jenkins, J.). Nonetheless, for the reasons set forth above--namely, the opportunistic use of privileged work product and its disclosure to an adversary--the confidentiality agreements do not save the day for MoFo and WSG&R. Also, the agreements executed in this case are little more than fig leafs. They grant the SEC and DOJ permission to share the disclosed information

United States District Court

For the Northern District of California

1  "in furtherance of the [agencies'] discharge of [their] duties and responsibilities."  With this

2  capacious clause, the law firms essentially leave the agencies to manage the disclosed

3  information as they see fit.  When, after sharing it with others, privilege-holders retain so

4  little power over their confidential work product, it is not proper to credit their subsequent

5  efforts to protect it.  See In re Qwest Commc'ns Int'l, Inc., 450 F.3d 1179, 1194 (10th Cir.

6  2006) (rejecting the argument that a confidentiality agreement with government regulators

7  preserved any privileges where "[t]he agreements [did] little to restrict the agencies' use of

8  the materials they received"); In re Chrysler Motors Corp. Overnight Evaluation Program

9  Litig., 860 F.2d 844, 847 (8th Cir. 1988) (rejecting the idea that a promise among contracting

10  parties to keep information confidential in the future when the privilege-holder had

11  intentionally disclosed the information in the formation of such a contract).  Finally, unlike

12  the case on which MoFo and WSG&R rely most heavily, in this case the party without the

13  work product faces the unfairness of "defend[ing] against the privilege holder's claim

14  without access to pertinent privileged materials that might refute the claim."  In re

15  McKesson, 2005 WL 934331, at *10 (quoting John Doe Co. v. United States, 350 F.3d 299,

16  304 (2d Cir. 2003)).

17       Finally, MoFo and WSG&R suggest that the privileges still apply because no written

18  materials were provided to the government.  The Court finds this argument specious.  It

19  makes no difference whether a privilege-holder copies a written text, reads from a written

20  text, or describes a written text to an outside party.  The purpose and effect is the same in all

21  cases; the transmission of privileged information is what matters, not the medium through

22  which it is conveyed.  MoFo and WSG&R cite no authority for the proposition that the

23  privileges should rest on such a formality, and this Court is unaware of any.  To the extent

24  that MoFo and WSG&R disclosed to the government information contained in any of the

25  written material identified in Reyes' subpoenas, the Court holds that the law firms have

26  waived any right to protect it under the attorney-client or work-product privileges.

27

28

**United States District Court**
For the Northern District of California

### II. Maxim

The third subpoena issued by Reyes seeks evidence from Maxim. The theory underlying this subpoena is that a man named Michael Byrd, who worked at Maxim between 1994 and 1999 and then became Chief Financial Officer at Brocade, imported Brocade's system for granting stock options from his former employer. Thus, Reyes' strategy is to gather evidence that Byrd, and not Reyes, is the true culprit in Brocade's backdating scandal. To that end, the subpoena demands production of the following items:

(1) All documents relating to or evidencing Michael Byrd's involvement in the design, administration or supervision of Maxim's option-grant programs or policies between 1994 and 1999.

(2) All documents relating to Maxim's internal investigation of stock-option grants and practices, announced in a Company press release dated July 3, 2006, including, for the period 1994 through 1999,

(a) all documents and records relating to or evidencing option grants to employees, including that names of option grantees, grant dates, and exercise prices;

(b) all documents related to the policy or practice of granting options to employees on their part-time start date;

(c) all documents related to the policy or practice of granting options to employees on their offer letter or interview date; and

(d) all documents related to the policy or practice of allowing employees to select their own option grant date.

(3) All documents related to the adequacy of controls, procedures and documentation of stock options grants between 1994 and 1999.

According to Reyes, the government will call Byrd as its "primary witness," and these materials are necessary to demonstrate that it was Byrd, not Reyes, "who created Brocade's option grant practices."

Though Maxim asserts no privilege in connection with these materials, it contends that Reyes' subpoena fails to comply with Rule 17(c). The Court agrees. First, Reyes has not demonstrated that the material demanded in the subpoena is relevant. In its indictment, the government charges Reyes with twelve counts, all of which are pertain to a common "scheme to defraud Brocade, its Board, its shareholders, its auditors, the public, and the SEC" as to the true character of the company's stock grants. It is immaterial where the

United States District Court

For the Northern District of California

scheme began, or who furnished the financial know-how necessary to design it; what matters, for purposes of Reyes' trial, is whether he helped implement the scheme and perpetuate it. The crimes with which he has been charged contain no element requiring proof that he was the mastermind or financial guru behind the alleged backdating of stock options at Brocade. Documents that may prove otherwise are therefore irrelevant. Simply put, the government need not prove that Reyes invented backdating, only that he did it.

Of course, Byrd's involvement in the backdating scandal may *become* relevant--for example, if Byrd denies his involvement in the scheme, or if the government at trial attempts to prove that Reyes was the accounting mastermind behind it. For now, however, the government has not denied that Byrd had a hand in the wrongdoing, and in fact, the indictment itself dispels any suggestion that Reyes crafted the backdating scheme alone. See Indictment ¶ 12 ("[D]efendants Gregory L. Reyes, Stephanie Jensen, *and others* knowingly and intentionally devised, and intended to devise, a scheme and artifice to defraud . . . .") (emphasis added). Thus, any evidence that Byrd was the architect of Brocade's stock-options system will become admissible, if ever, only to impeach testimony or evidence to the contrary. Again, the need to gather materials to impeach possible witnesses cannot support a request for pre-trial production via a Rule 17(c) subpoena. Nixon, 418 U.S. at 701; Fields, 663 F.2d at 881. And unlike the witness statements discussed above, there is currently no indication that such materials are likely to become relevant. The Court therefore considers *in camera* inspection of the Matrix materials unnecessary at this point in the proceedings.

Second, Reyes' subpoena does not request materials with sufficient specificity. His demand of Matrix is enormous in scope: it purports to compel the production of any and all information related to stock options issued between 1994 and 1999 by a multi-million dollar company with thousands of employees. This is the quintessential fishing expedition. Where, as here, a defendant requests any and all information related to a particular policy or procedure, courts have rejected such requests as an abuse of Rule 17(c). See United States v. Louis, 2005 WL 180885 (S.D.N.Y. 2005) (quashing a subpoena designed to discover information about criminal investigations conducted, and airport security procedures

United States District Court

For the Northern District of California

1  implemented, by the Department of Homeland Security).  A demand for "any and all

2  documents relating to several categories of subject matter . . . , rather than specific

3  evidentiary items," suggests that the subpoena's proponent "seeks to obtain information

4  helpful to the defense by examining large quantities of documents, rather than to use Rule 17

5  for its intended purpose--to secure the production for a court proceeding of specific

6  admissible evidence."  Id. at *5.

7       Contrary to Reyes' assertions, his subpoena is not "tailored" to obtain specific

8  documents.  Instead, it adopts a particular theory of defense and then casts a wide net with

9  the goal of reeling in something to support it.  Compare Nixon 418 U.S. at 700 (granting the

10  government's request for tape recordings of conversations among White House officials

11  where "the Special Prosecutor offered the sworn testimony or statements of one or more of

12  the participants in the conversations as to what was said at the time"), and MacKey, 647 F.2d

13  at 899 (9th Cir. 1981) (upholding an district court's order to compel production where the

14  defendant "[s]pecifically sought . . . a Brooks Brothers diary and a desk-type calendar kept

15  by [the defendant] at his office"), with Reed, 726 F.2d at 576-77 (finding an "insubstantial

16  showing of . . . specificity" where the defendant "did not request specific documents, but

17  sought entire arson investigation files" on the theory that they would identify "certain others

18  . . . [who] might have been contemporaneously involved in other arson activities").  A

19  specific theory of defense, however, is not the same thing as a request for specific

20  information.  Rule 17(c) demands the latter, and Reyes' subpoena provides only the former.

## CONCLUSION

22       Because Reyes' subpoena demands material that is neither relevant nor specific,

23  Maxim's motion to quash is hereby GRANTED.  By contrast, the subpoenas Reyes served

24  on the law firms both demand evidence that is specific, relevant, and likely to become

25  admissible, if only for impeachment purposes.  For this reason, the motions to quash filed by

26  MoFo and WSG&R are hereby DENIED, and the subpoenas hereby MODIFIED.

27       Obviously, it is not possible at this stage to determine what responsive documents are

28  likely to become admissible.  Nor, given that MoFo has provided no privilege log and

United States District Court

For the Northern District of California

1   WSG&R has provided only an outline of one, is it possible to determine which documents

2   contain information conveyed to the SEC and DOJ and therefore waived.  To assist with the

3   Court's inspection of these materials, MoFo and WSG&R are hereby ORDERED to produce

4   all responsive documents, including opinion and non-opinion work-product documents that

5   were based on interviews of Brocade employees.  The subpoenaed parties shall further

6   produce a comprehensive log of the materials produced, indicating the nature of each

7   document submitted, a brief description of the information contained therein, and a detailed

8   description of the basis for any residual privilege that may apply to documents that fall

9   within the scope of the subpoena but whose subject matter nonetheless was not disclosed to

10  the government.  See In re Sealed Case, 877 F.2d 976, 981 (D.C. Cir. 1989) (finding that a

11  waiver of certain materials entails a waiver of "all other communications relating to the same

12  subject matter"); United States v. Bauer, 132 F.3d 504, 507 (9th Cir. 1997) (noting that the

13  proponent of a privilege bears the burden of demonstrating its existence).

14          **IT IS SO ORDERED.**

15

16

17  Dated:  December 22, 2006              _____
                                          CHARLES  R. BREYER
18                                        UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

27

28