IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>GREGORY L. REYES,<br><br>    Defendant.                  / | No. C 06-00556 CRB<br><br>**ORDER DENYING MOTION<br>FOR A JUDGMENT OF ACQUITTAL** |

At the close of the prosecution's case-in-chief, Defendant Gregory Reyes moved for a judgment of acquittal, pursuant to Rule 29. After briefing and argument, the Court reserved decision on the motion. Now, viewing "the evidence [as it was] at the time the ruling was reserved," Fed. R. Crim. P. 29(b), the Court DENIES Defendant's motion for acquittal.

"In ruling on a Rule 29 motion, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" United States v. Alarcon-Simi, 300 F.3d 1172, 1176 (9th Cir. 2002) (quoting United States v. Bahena-Cardenas, 70 F.3d 1071, 1072-73 (9th Cir. 1995)). "The test applied is the same as the test for challenging the sufficiency of the evidence." United States v. Clayton, 108 F.3d 1114, 1116 (9th Cir. 1997) (citation omitted). "In ruling on a [motion for acquittal], a district court must bear in mind that 'it is the exclusive function of the jury to determine the

credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts.'" United States v. Rojas, 554 F.2d 938, 943 (9th Cir. 1977) (quoting United States v. Nelson, 419 F.2d 1237, 1241 (9th Cir. 1969)).

In simple terms, Reyes stands accused of understating the expenses of Brocade Communications Systems, a public company where he held the position of Chief Executive Officer. Under the relevant accounting rules in effect at the time of the alleged criminal scheme, Brocade was required to report a "compensation charge" whenever it granted stock options with a strike price below fair market value. The prosecution's theory is that, in order to avoid this compensation charge, Reyes "retrospectively priced" or "backdated" stock options. In other words, Brocade made it appear that the options had been granted on a day when the fair market value was much lower than the prevailing market price on the day when the options were actually granted. Through this practice of retrospective pricing, or backdating, Reyes made the options look as though they had been granted at fair market value, thereby allowing Brocade to avoid a compensation charge.

In its case-in-chief, the government presented significant evidence that a regular practice of retrospective pricing, or backdating, existed at Brocade. Several employees from Brocade's human resources department testified that the company had a system in place whereby a chart of historical stock prices was created; a favorable historical date and stock price were selected; paperwork was prepared in order to make it appear as though options had been granted on that more favorable date; and Reyes then signed the paperwork to make the grants official. Indeed, it is essentially undisputed that such a practice existed. It is also essentially undisputed that, as a result of the pricing practice, Brocade understated its compensation expenses. This backdating practice is the basis for the charges that Reyes participated in a criminal conspiracy (Count One), engaged in a scheme to defraud investors (Count Two), made false filings with the Securities and Exchange Commission (Counts Five, Six, and Seven), kept false books and records (Count Eight), and made false statements to the company's accountants (Counts Nine, Ten, Eleven, and Twelve).

//

2

In his motion for acquittal, Reyes claims that the evidence presented by the government in its case-in-chief is insufficient to sustain a conviction on any of these counts. His motion principally calls attention to two issues. First, Reyes argues that the government's evidence does not establish materiality. Put another way, he claims that the government has failed to show that investors cared about the compensation expenses that were omitted from or misrepresented by Brocade's financial statements. Second, Reyes claims the evidence does not establish that he acted with the requisite criminal intent. He notes that each of the counts charged requires the jury to find that he acted knowingly (*i.e.*, with an appreciation for the false or misleading character of the company's financial records, and not through ignorance or mistake), or willfully (*i.e.*, with the purpose of violating a known legal duty, and with an appreciation of the wrongfulness of his actions), or both. Reyes contends that the government has not produced evidence that he understood the accounting consequences of Brocade's backdating practice. He thus argues that there is insufficient evidence from which a jury could conclude beyond a reasonable doubt that he acted knowingly, willfully, or with an intent to defraud.

The Court notes that these two issues--materiality and criminal intent--are both generally inappropriate for resolution by a trial court upon a dispositive motion. Both questions require a determination about what was or was not in someone's mind. Materiality is a question about what investors consider important. Intent is a question about what the defendant knew or believed. Such questions about state of mind ordinarily are for the jury to decide. See, e.g., TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976) (observing, in the context of civil litigation, that "[t]he determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact."); Takahashi v. United States, 143 F.2d 118 (9th Cir. 1944) ("Here again, unless the court can say affirmatively that no circumstances were proven which might justify a finding of specific intent, the question was one of fact to be resolved by the jury. Questions of knowledge and intent are always questions of fact for the jury.").

3

1    As to the question of materiality, the Court is satisfied that a jury could find beyond a reasonable doubt that Brocade's practice of backdating stock options resulted in a significant omission or misrepresentation. Under the law, the government need not prove that investors actually would have behaved differently if they had known the information that was concealed from or misrepresented to them. Instead, the prosecution must show "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting TSC Industries, 426 U.S. at 449). That is, the government must demonstrate "a substantial likelihood that a reasonable shareholder would consider it important in deciding [whether to buy or sell securities]," not whether they actually would have traded those securities differently. TSC Industries, 426 U.S. at 449.

Testimony by several of the government's witnesses lends support to the conclusion that reasonable investors would have considered the compensation expenses not reported by Brocade material to their investment decisions. Robert McCormick, a employee of Fidelity Investments at the time of Brocade's alleged scheme, testified that his investment firm disapproved of stock option plans that allowed companies to grant in-the-money options. RT 1663-64, 1679-81. He testified that Fidelity, which had holdings as large as $2 billion in Brocade, voted its shares according to guidelines that discouraged the use of in-the-money options. RT 1674, 1677-78. He testified that Fidelity considered such options "a giveaway of shares," noting that in-the-money options did not align the interests of shareholders and employees effectively "because they were already worth something." RT 1681. McCormick's testimony suggests that Brocade's practice of backdating options would have been of concern, at least to a large shareholder like Fidelity, because the backdating practice led investors to believe that options were being granted at fair market value, when in fact they were being given to employees on terms more favorable than those available to the investing public.

//

4

1    Steven Catricks, a portfolio manager and equity analyst, also provided testimony
2 about the significance of understated compensation expenses. He testified that, at the time of
3 Brocade's alleged backdating scheme, he was paying little attention to stock option expenses
4 because he "just assumed that companies were not granting in-the-money stock options." RT
5 1819. He stated that granting in-the-money options was not "a common practice" and that,
6 as an investment professional responsible for managing a portfolio of different technology
7 stocks, he would have wanted to know if companies in that sector had been granting them.
8 RT 1821-22. He explained that a company's failure to account properly for in-the-money
9 options would "inflate" the bottom line such that the company's "net income would be higher
10 than it should have been from an accounting perspective." RT 1822. As a result, the
11 company would report excessive earnings-per-share, which Catricks described as one of the
12 "more important" metrics that investors used to evaluate a company's performance. RT
13 1812, 1822-23, 1829. Catricks stated that non-cash expenses, though perhaps not the most
14 important metric of a company's value or performance, were nonetheless pertinent to his
15 investment decisions. RT 1931.

16    Dr. John Garvey, an expert witness for the prosecution, provided testimony about the
17 size of the compensation expenses that went unstated as a result of Brocade's pricing
18 practices. Dr. Garvey testified that Brocade failed to recognize more than $173 million in
19 2001 and more than $161 million in 2002. He further testified that, if Brocade had properly
20 accounted for the stock options it had priced retrospectively, then the company would have
21 recorded a loss of $110 million in 2001, rather than the profit of $3 million it actually
22 reported, and would have recorded a loss of $45 million in 2002, rather than the profit of
23 nearly $60 million it actually reported. See RT 2048-2051; Exs. 968C, 969C.

24    Finally, the jury would be entitled to draw reasonable inferences about the purpose of
25 Brocade's retrospective pricing system from the system itself. After all, the principal (and
26 perhaps only) effect of the pricing system was to keep compensation expenses off of the
27 company's books. A reasonable juror could reasonably infer that the company maintained
28 such a pricing system, which human resources employees described as "a very difficult

5

process to get right," RT 120, because *the company* believed that investors cared about the expenses that were understated as a result of it. In other words, if investors really did not care about the compensation expenses created by stock options, the jury would be entitled to ask why the company went to the trouble of pricing them retrospectively, rather than just granting options in-the-money and accepting the accompanying accounting charge. If investors truly did not care about non-cash compensation expenses, then why bother to keep them off the books?

Granted, the defense poked a significant number of holes in the proof that the government presented. For instance, McCormick acknowledged that his expertise was limited to the realm of voting proxies and that his job as an analyst did not include buying or selling shares for Fidelity's mutual funds. RT 1698-99, 1705-08. Similarly, on cross-examination, Catricks conceded a number of things: that he did not actually make decisions about whether to buy or sell shares of Brocade; that other metrics of a company's performance were often more important for investors than earnings-per-share under GAAP; and that, in keeping with the "common practice among analysts," he frequently disregarded non-cash expenses, such as stock options, when assessing the value or performance of a company. RT 1828, 1833-37, 1847-48. Finally, the defense made the jury aware of a number of limitations regarding the assumptions that Dr. Garvey had made, or been asked to make, when running calculations about the compensation expenses understated by Brocade. See, e.g., RT 1777-81, 1977-86.

Nonetheless, the prosecution's case-in-chief provided adequate evidence to make the question of materiality one for the jury's consideration. Two financial professionals associated with Brocade's institutional investors both testified that stock option expenses were something that investors considered when evaluating the health and performance of the company. Both testified that investors would have cared about inaccuracies in the company's disclosure of its stock option expenses. And an expert witness told the jury that the company would have had to disclose hundreds of millions of dollars in additional compensation charges if they had not retrospectively priced their options. Combined with

6

the natural inference that the company would not have worked so hard to develop such a pricing system unless investors would have cared about its effect--which was to remove compensation expenses from the company's books--the Court concludes that there is adequate evidence to go to the jury on the question of materiality. In other words, based on the evidence presented during the prosecution's case-in-chief, a reasonable jury could conclude, beyond a reasonable doubt, that there is "a substantial likelihood that [the understatement of Brocade's compensation expenses] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting TSC Industries, 426 U.S. at 449).

As to the question of criminal intent, the Court likewise concludes that the prosecution presented adequate evidence for a jury to conclude, beyond a reasonable doubt as to all of the counts charged, that Reyes acted with the requisite state of mind. While there are fine gradations among the various counts charged regarding the *mens rea* that must be proved in order for the jury to convict Reyes, the most demanding of these charged counts, securities fraud, requires the government to prove that Reyes acted knowingly, willfully, and with an intent to defraud Brocade's shareholders. United States v. Tarallo, 380 F.3d 1174, 1181, 1185-86 (9th Cir. 2004). So long as there is sufficient evidence to send the counts of securities fraud to the jury, then *a fortiori* there would be sufficient evidence for the jury to consider the other counts as well, at least insofar as criminal intent is concerned.[1]

---

[1] Count One--conspiracy--is a somewhat different legal creature and requires a separate analysis. To prove a conspiracy, the government must show that an agreement existed between two or more persons to commit at least one of the crimes charged in the indictment; that Reyes became a member of the conspiracy, knowing of at least one of the conspiracy's objectives and intending to help accomplish it; and that Reyes performed at least one overt act for the purpose of carrying out the conspiracy. See Ninth Circuit Model Criminal Jury Instructions 8.16.

The evidence presented by the government during its case-in-chief was sufficient to allow the conspiracy count to go to the jury. It is undisputed that Reyes approved nearly all the stock option grants in question, as well as the management representation letters to the company's auditors and the financial statements that Brocade filed with the SEC. These "overt acts" furthered the alleged conspiracy to keep compensation expenses off of Brocade's books, records, statements to accountants, and SEC filings, all with the effect of misleading investors about the company's "bottom line." Further, the jury could reasonably infer from Reyes' approval of the

7

Through the Court expressed concern at the hearing on Defendant's motion about the government's evidence regarding Reyes' state of mind, the Court's review of the evidence has allayed those concerns. First, there sufficient evidence for a jury to conclude that Reyes approved stock option grants knowing that the "date" of the grant had been selected retrospectively in order to obtain a favorable strike price. Indeed, personnel in Brocade's human resources department testified that they would attach historical charts showing the performance of Brocade's stock, highlighting recent "lows" in the stock price, so that Reyes "could see the performance" when he approved the grants. RT 115-20. From this testimony alone, the jury is entitled to draw an inference that Reyes knew about retrospective pricing and approved of it.

As to the next question, whether Reyes appreciated the fact that the retroactive pricing allowed the company to circumvent required compensation charges, the government's case-in-chief provided evidence sufficient for a jury to conclude that he did. For instance, when confronted about these practices during a subsequent investigation into the company's stock options program, Reyes insisted that he had no knowledge of retrospective pricing. RT 2155-60. Thus, Reyes' denial that he was aware of any retroactive pricing is evidence that he knew his conduct was wrongful. United States v. Perkins, 937 F.2d 1397, 1402 (9th Cir. 1991) ("[F]alse statements may be considered as circumstantial evidence of consciousness of guilt, and . . . it is up to the jury to determine the significance of the evidence.").

---

grants that he was in cahoots with the other people who were responsible for the selecting favorable historical prices.

The inference that Reyes participated in a conspiracy is supported by testimony from Brocade's "compensation and benefits manager," Stephen Beyer, who testified that he had raised concerns about the possibly unethical or illegal nature of Brocade's pricing system. According to Beyer, after raising these concerns he was told by Stephanie Jensen, Reyes' alleged co-conspirator, that Reyes himself wanted the company to price options retrospectively. See RT 268 ("Q. What did Ms. Jensen tell you when you expressed your concerns about the ethics and the legality of what was going on at Brocade? A. Her response was that she was not concerned about the legality of the issue, and that we had been directed by Greg Reyes to complete the process, and we were going to do so."). To the extent that there remains a question about whether Reyes "agreed to commit one of the crimes charged in the indictment," the evidentiary analysis is subsumed by the analysis set forth above regarding the other counts.

8

Other evidence, construed in the light most favorable to the prosecution, also suggests that Reyes appreciated the accounting consequences of backdated options. First, according to an attorney responsible for investigating Brocade's stock options program, Reyes stated that, at some point during his tenure as CEO, he became aware that the granting of stock options carried "accounting implications." RT 2201-03. Although the witness provided few additional details about exactly what Reyes understood or when he understood it, a jury could infer from the testimony that, at the time Reyes approved the grants, he appreciated the effect of the retrospective pricing system on the company's financial statements.

Second, Reyes received an e-mail attachment containing summaries of the relevant accounting rules related to stock options. Although there was no direct testimony that Reyes understood or even read this attachment, it would be reasonable for a jury to infer that he did, especially given testimony from human resources personnel that Reyes was "very, very interested" in possible changes to the stock options program. RT 546-61.

Third, Reyes sent an e-mail to a colleague in which he stated: "IT IS ILLEGAL TO BACKDATE STOCK OPTIONS." Ex. 648; RT 2080-84. It is true that Reyes sent this message in connection with his duties as a member of the Board of Directors of another company, and it is also arguable that Reyes was referring in this e-mail to a particular type of stock option grant for Section 16(b) officers, not the type of rank-and-file grants that he signed as CEO of Brocade. RT 2090-91, 2099, 2106-11. Nonetheless, this e-mail supports an inference that Reyes appreciated the both consequences and illegality of retrospectively pricing stock options. Indeed, even the defense's explanation of this e-mail (that it referred to the strictures of a particular provision of the Sarbanes-Oxley Act of 2002) suggests that Reyes had an understanding of the laws and regulations relating to stock options.

Fourth, there is the testimony of June Weaver, a Brocade human resources employee. Weaver testified that she visited Reyes' office periodically to give him the stock option grants and prices that the human resources department had decided to recommend for his approval. RT 566. She recalled that Reyes stated, during one of these visits to her office, "It's not illegal if you don't get caught." RT 567. On cross-examination, Weaver stated that

9

she never had a discussion with Reyes about accounting for stock options and that she had no specific recollection whether Reyes had made this comment referring to the actual practice of backdating. RT 574-76. Nonetheless, Weaver's vague recollection about the statement is sufficient to support an inference that Reyes appreciated the wrongfulness of the company's pricing practices.

Finally, Reyes himself signed Brocade's financial statements and management representation letters. See, e.g., Exs. 27, 44. Both of these types of documents contained a certification by Reyes, as the CEO, that the company's financial statements contained no fraudulent or false information. Further, the company's annual financial report specifically stated that Brocade had accounted for stock options in accordance with Accounting Principles Board Opinion 25, "whereby the difference between the exercise price and the fair market value at the date of grant is recognized as compensation expense." Ex. 27 at 54. Although a jury could view Reyes knowledge about the precise contents of these documents with skepticism, given his supervisory role as CEO, it would also be reasonable for a jury to infer from his approval of these documents that Reyes understood the accounting treatment of stock options described therein.

To be sure, there are arguments to be made in opposition to the government's evidence that Reyes acted knowingly, willfully, and with the intend to defraud. But it is not the function of the Court to weigh the merits of such arguments or to determine which inferences should be drawn from the evidence. "'[I]t is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts.'" Rojas, 554 F.2d at 943 (quoting Nelson, 419 F.2d at 1241). On a motion for judgment of acquittal, the Court's limited role is to determine "'whether . . . *any rational trier of fact* could [find] the essential elements of the crime beyond a reasonable doubt,'" and only after "'viewing the evidence *in the light most favorable to the prosecution*.'" Alarcon-Simi, 300 F.3d at 1176 (quoting Bahena-Cardenas, 70 F.3d at 1072-73) (emphasis added). Viewing the evidence through this lens, the Court concludes that a reasonable jury could convict Reyes on the charged counts, finding both that he acted

with the requisite state of mind and that the understated compensation expenses were material to reasonable investors. Accordingly, Defendant's motion for a judgment of acquittal under Rule 29 is DENIED.

**IT IS SO ORDERED.**

Dated: August 3, 2007

CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE